**SIGNED THIS: August 16, 2006**

                                            */s/ Mary Gorman*
                                            **MARY P. GORMAN**
                                          **UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

```
In Re                            )
                                 )   In Bankruptcy
CLAUDE J. FORTIN and             )
NANCY B. FORTIN,                 )   Case No. 03-75277
                                 )
          Debtors.               )
_____)
                                 )
CILLNET, INC.,                   )
                                 )
          Plaintiff,             )
                                 )
     v.                          )   Adversary No. 04-7034
                                 )
CLAUDE J. FORTIN,                )
                                 )
          Defendant.             )
```

## O P I N I O N

    The issue before the Court is whether the affidavit of Plaintiff's principal creates a genuine issue of material fact

-1-

which precludes granting summary judgment in favor of the Defendant.

The Plaintiff, Cillnet, Inc., was an internet service provider based in Hillsboro, Illinois. Frank Elam was its sole shareholder, officer, and director. In July, 2001, Cillnet sold its business to CyberCity Communications, Inc., an Illinois corporation, doing business as Motion Internet & Networking. The agreement provided for the assignment of 1,983 Cillnet customers to CyberCity for a purchase price of $446,175. The payment terms included $25,000 at closing and 36 monthly installments of $11,699.31. The agreement provided for an adjustment of $225 for every customer short of or in excess of the 1,983 customers contemplated in the agreement. Craig Lansing signed the agreement on behalf of CyberCity as its President.

Some payments were made by CyberCity pursuant to the agreement by checks drawn on a CyberCity account and signed by the Defendant, Dr. Claude Fortin. In addition, Dr. Fortin wrote at least one check to Cillnet on his personal account. Nevertheless, CyberCity fell behind in its payments to Cillnet.

CyberCity, through its attorney, Carl Draper, and Cillnet, through Mr. Elam and his attorney, negotiated through the fall of 2001 and into the summer of 2002 regarding CyberCity's default and a revaluation of the assets purchased by CyberCity from Cillnet. Dr. Fortin did not directly participate in these negotiations.

On March 11, 2002, Dr. Fortin entered into a Buy/Sell Agreement with Joe Rupnik.  The agreement recognized that CyberCity needed an immediate infusion of capital to sustain its business while it negotiated to sell its business to Hanson Information Systems, Inc., another internet service provider.  The agreement noted that CyberCity investors would lose all of their investment without a loan to keep the business viable, that conventional financing through local banks could not be obtained, and that a "creative funding mechanism" was mandated.  In exchange for a $150,000 capital infusion, Mr. Rupnik received "50% of the Hanson service contract and 50% of related revenue generated from said contract."

Pursuant to another agreement dated July 3, 2002, and signed August 9, 2002, CyberCity sold its business to Hanson.  The sale price was based on a percentage of the net revenue generated by each customer.  Joe Rupnik was also a party to the agreement.  Mr. Rupnik is listed on a schedule attached to the agreement as being owed $120,000 by CyberCity for a personal loan.  The debt to Cillnet is listed on the same schedule at $200,000 and described as "under final negotiation."

Sometime in the summer of 2002, Dr. Fortin and his attorney, Mr. Draper, met with Mr. Elam and his attorney to discuss the renegotiation of the purchase price and the payment schedule from the original Cillnet to CyberCity sale.  The parties eventually

entered into a Settlement Agreement signed by Dr. Fortin on October 30, 2002, and by Mr. Elam on November 1, 2002. The Settlement Agreement provided that CyberCity would pay Cillnet $250,000 with monthly payments of $5,000 beginning on June 1, 2002, rising to $10,000 on May 1, 2003, and ending with a balloon payment on February 1, 2004. Dr. Fortin personally guaranteed CyberCity's obligation to Cillnet.

Dr. Fortin made the adjusted contract payments on behalf of CyberCity until May, 2003. Neither Dr. Fortin nor CyberCity made any payments to Cillnet after May, 2003. Following the default, Cillnet commenced an action against Dr. Fortin to collect on the personal guaranty. Dr. Fortin responded by filing a petition pursuant to Chapter 7 of the Bankruptcy Code on November 13, 2003. Dr. Fortin scheduled Cillnet as holding an unsecured claim in the amount of $200,000.

Cillnet commenced this adversary proceeding to determine the dischargeability of Dr. Fortin's debt. Cillnet's complaint is based on 11 U.S.C. § 523(a)(2)(A), which provides as follows:

>   (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
>
>   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
>
>   (A) false pretenses, a false representation, or actual fraud(.)

Courts have historically required a creditor to establish the

-4-

following elements by a preponderance of the evidence: (1) the debtor made a representation to the creditor; (2) the debtor's representation was false; (3) the debtor possessed *scienter*, i.e. an intent to deceive; (4) the creditor relied on the debtor's misrepresentation, resulting in a loss to the creditor, and (5) the creditor's reliance was justifiable. Field v. Mans, 516 U.S. 59, 116 S.Ct. 437 (1995). The Seventh Circuit applies an expanded reading of "actual fraud" to include any deceit, artifice, trick, or design involving direct or active operation of the mind, used to circumvent and cheat another. McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000). In order to prove a claim based on actual fraud, the creditor must prove that: (1) a fraud occurred; (2) the debtor was guilty of intent to defraud, and (3) the fraud created the debtor that is the subject of the discharge dispute. Id. *at* 894.

The existence of fraud for nondischargeability purposes may be inferred if the totality of circumstances presents a picture of deceptive conduct by the debtor which indicates that he or she intended to deceive or cheat the creditor. In re Schmidt, 70 B.R. 634 (Bankr. N.D. Ind. 1986). A breach of a contract or a failure to perform some promised act, by itself, will not render a debt nondischargeable under § 523(a)(2)(A), although entering into a contract or promising an act with no intention of performance may support a finding of nondischargeability. In re Faulk, 69 B.R.

-5-

743, 750 (Bankr. N.D. Ind. 1986).

Cillnet alleges in its Complaint that Dr. Fortin fraudulently induced it to enter into the Settlement Agreement by making the following false and misleading statements:

- A. That [Dr. Fortin] [w]as the 100% sole shareowner and owner of CyberCity;

- B. That CyberCity was being sold in its entirety to Hanson;

- C. That the installment payments due under the sale agreement between CyberCity and Hanson would be more than sufficient to cover the repayment of the proposed compromised and restructured indebtedness which the plaintiff was being requested to accept, and

- D. That CyberCity had no other liens and encumbrances against its cash flow that would impair the payment of moneys from Hanson to CyberCity to retire the compromised and restructured indebtedness which the plaintiff was being requested to accept.

As part of discovery in this case, the deposition of Mr. Elam was taken on September 2, 2005. Mr. Elam testified that, in July, 2001, he negotiated with Craig Lansing for the sale of Cillnet to CyberCity. He did not meet Dr. Fortin at that time, but Mr. Lansing told him that Dr. Fortin was a co-owner and the money behind CyberCity. Mr. Elam was not made aware of the percentage of ownership of Mr. Lansing and Dr. Fortin, but he understood from Mr. Lansing that Dr. Fortin had the final word on decisions for CyberCity.

Although CyberCity made its initial down-payment to Cillnet, payments stopped within a few months because of a discrepancy

-6-

concerning the number of users.  Mr. Elam believed that Cillnet delivered all of the promised customers, but customers were bailing out due to poor service from CyberCity.  Mr. Elam continued to negotiate with Mr. Lansing through September, 2001, at which point Mr. Lansing informed him that Dr. Fortin was "the owner now."

From the fall of 2001 through the spring of 2002, negotiations continued through the lawyers.  Cillnet filed several collection suits against CyberCity.  The original contract and all the litigation was between Cillnet and CyberCity; there were no personal guarantees.

The one and only meeting of Dr. Fortin and Mr. Elam to discuss settlement occurred in the summer of 2002.  According to Mr. Elam's deposition testimony, Dr. Fortin said that he could not pay the debt to Cillnet unless the contract was renegotiated.  Dr. Fortin stated that he could get Cillnet its money through the sale to Hanson.  Mr. Elam did not have any discussion with Dr. Fortin about the ownership of CyberCity or what happened to Mr. Lansing because he did not want to pry into his personal affairs.  Mr. Elam stated that it did not matter to him who owned the company as long as he got paid.  Dr. Fortin told Mr. Elam about the pending sale of CyberCity to Hanson, but he did not go into details such as whether all or part of the business was being sold or any of the terms of the sale.  Dr. Fortin never explained how the Hanson money would end up in Cillnet's pocket.

Mr. Elam never asked Dr. Fortin for his personal financial statement or the balance sheet of CyberCity. Dr. Fortin did not make any representations about his personal wealth.

As a result of the meeting with Dr. Fortin, Cillnet received the personal guaranty of Dr. Fortin. Mr. Elam testified that the true value of the settlement agreement was this personal guaranty.

Mr. Elam testified that he was upset when he subsequently learned about Mr. Rupnik's involvement in the Hanson deal. He felt like Mr. Rupnik "came in on the picture and the money got diverted and paid him, basically to get him paid off first, and the rest of it, I was left out in the cold." However, Mr. Elam admitted that neither Dr. Fortin nor his agents made any representations about Mr. Rupnik. Mr. Elam did not learn about Mr. Rupnik until after the bankruptcy was filed.

Dr. Fortin has filed a motion for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Bankr.P. 7056, incorporating by reference Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986). Summary judgment will be granted only where it is clear that there is no dispute about the facts or inferences to be drawn therefrom. Central Nat. Life Ins. Co. v. Fidelity and Deposit Co.

of Maryland, 626 F.2d 537 (7th Cir. 1980). On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. In re Chambers, 348 F.3d 650 (7th Cir. 2003). It is not the role of the trial court to weigh the evidence or to determine its credibility, and the moving party cannot prevail if any essential element of its claim for relief requires trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2005 (1986). The movant bears the burden to prove each fact material to its claim and to establish that each fact is not in genuine dispute. If the movant fails to make that showing, summary judgment is not proper and must be denied. In re Rogstad, 126 F.3d 1224, 1227-28 (9th Cir. 1997).

Dr. Fortin persuasively argues that Mr. Elam's deposition testimony belies the allegations of fraud in his complaint. Mr. Elam's deposition testimony makes it clear that Dr. Fortin never claimed to be the 100% sole shareholder of CyberCity or that CyberCity was being sold in its entirety to Hanson. Mr. Elam also admitted in his deposition that Dr. Fortin never claimed that the installment payments due from the Hanson contract would be more than sufficient to cover the proposed payments under the proposed settlement agreement. Dr. Fortin never told him any of the details of the Hanson deal. There were no representations by Dr. Fortin as to how much the Hanson deal was worth or how the money was to be paid. Mr. Elam stated that he just had the "general sense" that he

was not going to get paid unless the Hanson deal went through. Finally, Mr. Elam's deposition testimony contradicted his claim that Dr. Fortin falsely claimed that CyberCity had no other liens or encumbrances against its cash flows that would impair the payment of the Hanson money from CyberCity to Cillnet.

Cillnet's initial response to Dr. Fortin's motion for summary judgment was stricken by an order dated April 26, 2006, and Cillnet was given 30 days to file an amended response. When Cillnet failed to file an amended response, the Court entered an order on June 6, 2006, granting Dr. Fortin's motion for summary judgment and dismissing the adversary proceeding with prejudice. On the next day, June 7, 2006, Cillnet filed a motion to vacate summary judgment and asked for leave to file a revised affidavit of Mr. Elam in opposition to the motion for summary judgment. The Court vacated the summary judgment on June 27, 2006, and the revised affidavit was filed.

It is a well-settled rule in the Seventh Circuit that a party may not "thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." Bank of Illinois v. Allied Signal Safety Restraint Systems, 75 F.3d 1162, 1168 (7th Cir. 1996). The two exceptions to this rule are where the affidavit clarifies ambiguous or confusing testimony and where the affidavit is based on newly-discovered evidence. Adelman-Tremblay v. Jewel Companies, Inc., 859 F.2d 517, 520 (7th

Cir. 1988). Mr. Elam's affidavit does not fall within either exception.

Mr. Elam's affidavit is consistent with his deposition testimony that Dr. Fortin never represented that he was the 100% sole shareholder and owner of CyberCity. It was Mr. Lansing who informed Mr. Elam that CyberCity was "wholly controlled and operated" by Dr. Fortin. Dr. Fortin was not present when this statement was made by Mr. Lansing. Moreover, "100%" ownership and "controlled and operated by" are two distinct concepts. Someone can control and operate a company with a 51% ownership interest. Further, the Court finds no merit in Plaintiff's suggestion that Dr. Fortin's statements at the meting that "he" would do certain things were affirmative representations that Dr. Fortin was the 100% shareholder of CyberCity. Mr. Elam's clear and unambiguous testimony at his deposition was that Dr. Fortin never represented that he owned any particular amount of the CyberCity stock and, more importantly, that Mr. Elam did not care who owned the company.

Mr. Elam's affidavit does not support his claim that Dr. Fortin falsely claimed that CyberCity was being sold in its entirety to Hanson. Mr. Elam stated in his deposition that Dr. Fortin only referred to the "sale to Hanson"; Dr. Fortin never made any representations about selling all or part of CyberCity to Hanson. In any event, the contract between Hanson and CyberCity which Mr. Elam attached to his affidavit provides that CyberCity

-11-

will sell "all the assets, business and goodwill" of CyberCity. Thus, even if Dr. Fortin made such a statement, it was not a false statement.

Mr. Elam's statement in his affidavit that Dr. Fortin told him that the Hanson payments "would be more than sufficient to pay the adjusted amounts" under the settlement agreement contradicts his deposition testimony. Mr. Elam testified at his deposition that Dr. Fortin gave him "no details other than the fact he was going to sell it, and he was negotiating the contract." Mr. Elam testified at his deposition that Dr. Fortin never told him how much he was going to get from the Hanson deal. Mr. Elam admitted in its deposition that he calculated on his own based on his experience in the business that there would be "ample cash flow to pay his debts", but Dr. Fortin never quantified "a dollar, any type of monetary numbers." In light of this clear and unambiguous testimony, the Court rejects Mr. Elam's affidavit statement on this point.

With respect to Cillnet's allegation that Dr. Fortin falsely represented that CyberCity had no other liens or encumbrances which would impair his ability to use the Hanson money to retire the Cillnet debt, Mr. Elam states in his affidavit that he and his attorney specifically questioned Dr. Fortin about other creditors, and Dr. Fortin told them that there were no other creditors who would prevent him from paying the Cillnet debt from the Hanson

-12-

proceeds. Mr. Elam states in his affidavit that, if he knew that Mr. Rupnik was going to get 50% of the Hanson revenue, then he would not have entered into the settlement agreement.

In neither the affidavit nor the deposition does Mr. Elam claim that Dr. Fortin represented that 100% of the Hanson revenue was going to go to Cillnet. Moreover, the deposition of Mr. Elam clearly demonstrates that Dr. Fortin was never asked about other liens or creditors:

> Q: . . . [y]ou didn't ask Claude [Fortin] for a financial statement or balance sheet of Motion [CyberCity], is that right?
>
> A: No, I did not.
>
> Q: Okay. And did he make any comments about the financial condition of CyberCity at that time?
>
> A: Other than the fact that he said, I can't, I can't make my debts under the original agreement.
>
> Q: Okay. All right. So he didn't sit down with you and say, I've got all these guys I have got to pay? He just said, I can't do it?
>
> A: No, because I would be involved in his personal business and I didn't want to ask that.

*Transcript of Discovery Deposition of Frank Elam taken September 2, 2005,* pp. 32-33.

Mr. Elam gave clear answers to unambiguous questions at his deposition; the affidavit is a sham which does not create a genuine issue of material fact.

For the foregoing reasons, the Court finds that there are no genuine issues of material fact and that the Defendant is entitled

to summary judgment.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###